709 N.E.2d 1043 (1999)
Roberta KING and Michael King, Appellants-Plaintiffs,
v.
Jack P. CLARK, M.D., Appellee-Defendant.
No. 43A03-9801-CV-00039.
Court of Appeals of Indiana.
April 23, 1999.
*1044 Mary A. Findling, Deborah K. Pennington, Findling Garau Germano & Pennington, Indianapolis, Indiana, Attorneys for Appellants.
Mark W. Baeverstad, N. Jean Schendel, Hunt Suedhoff, LLP, Fort Wayne, Indiana, Attorneys for Appellee.

OPINION
BAKER, Judge.
Appellants-plaintiffs Roberta King and Michael King (collectively the Kings) appeal the trial court's denial of their motion for judgment on the evidence as the result of a jury's verdict entered in favor of the appellee-defendant Dr. Jack P. Clark upon their complaint for medical malpractice. The Kings also claim that the trial court erroneously instructed the jury with respect to Dr. Clark's affirmative defenses of contributory negligence and incurred risk. Furthermore, Dr. Clark cross-appeals the trial court's failure to instruct the jury on the loss of chance doctrine and asserts that the trial court erred in failing to provide the jury with verdict forms authorizing them to reduce the Kings' damages in light of Roberta's own negligence.

FACTS[1]
On October 15, 1988, Roberta consulted Dr. Clark, her family physician, regarding a lump in her right breast. Roberta first noticed the lump approximately two weeks prior to the October appointment. After performing a physical examination, Dr. Clark noted a one-inch, smooth movable lump on the breast. Dr. Clark made a diagnosis of fibrocystic disease and requested that Roberta undergo a mammogram. Dr. Clark then instructed Roberta to return to his office after completing that test to discuss the results. Dr. Clark also desired to reevaluate the breast lump, and to perform a possible aspiration of the lump. However, Roberta failed to keep the follow-up appointment that had been made for her. Instead, Roberta telephoned Dr. Clark's office to obtain the results of the mammogram and informed his staff that she wished to cancel the appointment.
Roberta eventually returned to Dr. Clark's office on October 20 at a nurse's urging, to discuss the mammogram results. The report evidenced extensive fibrocystic disease in both breasts. On October 20, Dr. Clark performed a needle aspiration of the lump in Roberta's right breast, which revealed no malignancy.
Thereafter, on November 20, 1992, Roberta again made an appointment with Dr. Clark for an examination of a lump that had appeared under her left breast. While the lump had been present for several months, Roberta did not complain of any soreness. During an examination, Dr. Clark determined that the lump was located in Roberta's ribcage area. Furthermore, the lump was swollen and measured approximately one inch by two inches. As a result, Dr. Clark ordered a mammogram to evaluate the fibrocystic changes that may have occurred, and advised Roberta to return to his office in one week.
Roberta completed the mammogram of both breasts on December 2, 1992 which revealed fibrocystic change but no abnormal growth. The radiologist also reported no significant change when comparing the results with the tests that were performed in 1988. On January 29, 1993, Roberta returned to Dr. Clark's office for a scheduled two-month check-up. As Roberta still reported feeling lumps in her breasts, Dr. Clark again performed a breast examination[2] *1045 and instructed her to return for reevaluation in four months.
Roberta eventually returned to Dr. Clark's office on June 15, 1993, where her blood pressure was evaluated. She voiced no other complaints during that appointment. Pursuant to Roberta's request, Dr. Clark performed another breast examination, where he determined that both remained fibrocystic. Roberta consulted with Dr. Clark again on October 23, 1993, complaining that her left breast had been swollen, sore and red, for approximately three to four weeks. R. at 234. During that appointment, Dr. Clark discovered a firm mass in the left breast during the examination. The area was tender and pink. Based upon Roberta's reported history, Dr. Clark made a working diagnosis of mastitis of the left breast. As a result, Dr. Clark prescribed an antibiotic for the mastitis, ordered an ultrasound and mammogram and advised Roberta that he wanted to examine her again in three days to rule out inflammatory breast cancer. While Roberta returned to Dr. Clark's office on November 13, 1993, she did not undergo the tests that Dr. Clark had ordered due to tenderness in her breast. During the November 13 office visit, Dr. Clark re-ordered the ultrasound and mammogram and made an appointment for the testing. Although Dr. Clark advised Roberta to return to his office in two weeks, she failed to contact his office. Moreover, she did not have the ultrasound and mammogram testing. Instead, Roberta sought treatment from Dr. Richard Cross on November 29, 1993. At that time, Dr. Cross performed the mammogram that Dr. Clark had ordered five weeks earlier. The results suggested inflammatory breast cancer. Dr. Cross then performed a biopsy which confirmed that suspicion. Sometime in December of 1993, at Dr. Cross' suggestion, Roberta consulted with Dr. George Sledge, an oncologist, for further treatment. Dr. Sledge recommended treatment commencing in two weeks involving a massive six-month chemotherapy program, followed by a mastectomy, radiation therapy, a bone marrow transplant and additional chemotherapy. Notwithstanding Dr. Sledge's recommendation, Roberta sought yet another referral from Dr. Cross.
On December 26, 1993, Roberta consulted Dr. Jorge Frank at the Cancer Treatment Centers of America Hospital in Zion, Illinois. Dr. Frank recommended that Roberta undergo a program of chemotherapy treatment. Following his suggestion, Roberta completed the first cycle of chemotherapy between December 28, 1993 and January 2, 1994. Roberta did not return to see Dr. Frank for subsequent treatments. Rather, on January 13, 1994, Roberta sought a third opinion from Dr. Cal Streeter. He recommended an alternative course of chemotherapy which included a vitamin supplement. Roberta elected to complete only four of six chemotherapy courses that Dr. Streeter had recommended. Dr. Cross agreed that completing only four of six courses of recommended chemotherapy would diminish the chances of the patient's survival.
Thereafter, on June 6, 1994, Roberta consulted Dr. James Hollinger, a general surgeon, for an additional opinion concerning the mastectomy that she had been advised to undergo. He, along with the other three physicians who had examined Roberta, advised her that she should undergo the procedure. Roberta refused, but ultimately underwent a lumpectomy in June, 1994. Following the surgery, an examination of the breast tissue that was removed revealed the presence of cancer cells.
Pursuant to Indiana's Medical Malpractice Act, the Kings filed a proposed complaint for damages with the Indiana Department of Insurance. A medical review panel rendered its opinion on August 25, 1995, concluding that Dr. Clark failed to comply with the appropriate standard of care with respect to Roberta's January 29, 1993 office appointment. Thereafter, on October 2, 1995, the Kings filed a complaint for damages in the trial court, asserting that Dr. Clark failed to timely diagnose and treat Roberta's breast cancer. Moreover, Roberta asserted that Dr. Clark's negligence reduced her opportunity for survival which caused her pain and suffering, mental anguish and resultant medical expenses. The King's alleged that Dr. Clark's malpractice occurred between November, 1992 through November, 1993. Michael also asserted a claim against Dr. Clark *1046 seeking damages for loss of consortium. During a jury trial which commenced on October 20, 1997, the Kings moved for judgment on the evidence with respect to the issues of contributory negligence and incurred risk at the close of Dr. Clark's case. The trial court denied the motion. Over the Kings' objections, the trial court gave Dr. Clark's tendered instructions with regard to contributory negligence and incurred risk. Thereafter, on October 23, 1997, the trial court entered judgment upon the jury's verdict in favor of Dr. Clark.
The Kings now appeal.

DISCUSSION AND DECISION
The Kings contend that the trial court erroneously instructed the jury with respect to the defenses of contributory negligence and incurred risk. Specifically, they assert that it was error to instruct the jury as to those defenses because no evidence was presented at trial establishing the existence of contributory negligence or incurred risk.
To resolve this issue, we initially note our standard of review. When determining whether error resulted from the giving of an instruction, we apply the following three prong test: 1) whether the tendered instruction correctly states the law, 2) whether there is evidence in the record to support giving the instruction, and 3) whether the substance of the instruction is covered by other instructions which are given. Smith v. Hull, 659 N.E.2d 185, 191 (Ind.Ct.App.1995), trans. denied. Moreover, the decision to give a particular instruction rests with the trial court's sound discretion, and will be reviewed only for an abuse of that discretion. Kelley v. Watson, 677 N.E.2d 1053, 1056 (Ind.Ct.App.1997). Specifically, the giving of instructions will be reversed only if the instructions given, as a whole, failed to advise the jury of the applicable law or misled the jury. Id. We note that a trial court may be justified in giving an instruction if there is any evidence to support the instruction. Underly v. Advance Machine Co., 605 N.E.2d 1186, 1191 (Ind.Ct.App.1993), trans. denied. If there exists any facts or circumstances in the case although quite meager, to which the instructions might, upon any view, be pertinent,. . . it would not be error to give them, although they were so given to the jury over the objection of the complaining party. Pardue v. Seven-Up Bottling Co. of Indiana, 407 N.E.2d 1154, 1156 (Ind.Ct.App.1980).
In the instant case, the trial court instructed the jury as follows with respect to contributory negligence:
It is the duty of the patient to use such care as a person of ordinary prudence would ordinarily use in circumstances like her own, and if the patient fails to do this, and the failure is a proximate cause of the injuries for which she seeks to recover, she cannot hold the physician answerable for the consequences of her own lack of ordinary care.
If you find that Roberta King failed to exercise reasonable care, which failure proximately contributed to the injuries for which she seeks damages, your verdict should be for Dr. Clark.
R. at 63.
Additionally, the trial court gave the following instruction on incurred risk:
The question of whether or not Roberta King voluntarily incurred the risk of injury is an issue in this case. When a person knows of a danger, understands the risk involved and voluntarily exposes herself to such danger, that person is said to have incurred the risk of injury.
The doctrine of incurred risk is based on the proposition that one incurs all the ordinary and usual risks of an act upon which she voluntarily enters, so long as those risks are known and understood by her. The doctrine is applicable when two elements are present. First, the plaintiff must act voluntarily. Second, she must know and understand the risk to which she voluntarily exposes herself.
If Roberta King voluntarily incurred an increased risk in her cancer recurring, your verdict should be for Dr. Clark.
R. at 64.
This court has determined that a patient's contributory negligence or incurred risk operates as a complete defense to medical negligence. Smith, 659 N.E.2d at 191. Moreover, in Memorial Hosp. of South Bend, Inc. v. Scott, 261 Ind. 27, 36, 300 N.E.2d 50, 56 (1973), our supreme court established the *1047 rule of contributory negligence in medical malpractice actions as follows:
The general rule on the issue of the plaintiff's contributory negligence is that the plaintiff must exercise that degree of care that an ordinary reasonable man would exercise in like or similar circumstances. Contributory negligence is conduct on the part of the plaintiff, contributing as a legal cause to the harm he has suffered, which falls below the standard to which he is required to conform for his own protection.
(Emphasis in original); see also Smith, 659 N.E.2d at 191.
While the Kings urge that the evidence failed to establish that Roberta had incurred the risk or was contributorily negligent, the evidence most favorable to the verdict demonstrates that Roberta waited three to four weeks before seeking a medical evaluation of the symptomatic left breast in October of 1993. Moreover, she did not report her symptoms when she contacted Dr. Clark's office on October 16, 1993. Roberta also delayed an additional five weeks before obtaining the diagnostic testing that Dr. Clark had ordered.
At trial, Dr. Susan Lottich, an expert witness that the Kings had retained, testified that Roberta had an extremely aggressive-looking cancer that grows so rapidly that the cells could double in number within eight or nine days. R. at 325, 346-47. Dr. Lottich also emphasized that it is critical to treat a cancer as early as possible because any delay allows the cells to become more aggressive and resistant to treatment. R. at 315-17. Dr. Lottich then acknowledged the possibility that cancer cells will spread to other areas of the body increases as the number of cancer cells increases.
We also note that after Dr. Cross had diagnosed Roberta's cancer, he referred her to Dr. Sledge, the oncologist. Dr. Cross testified that Roberta had an aggressive cancer requiring immediate treatment, and that he had communicated his opinion to Roberta. During an appointment, Dr. Sledge recommended to Roberta that she immediately begin six courses of chemotherapy, followed by a mastectomy, radiation therapy, and more chemotherapy. However, Roberta elected to disregard Dr. Sledge's recommendations and instead sought consultations from other physicians. When Roberta counseled with Dr. Frank one month later at the Cancer Treatment Center, he also recommended that Roberta immediately begin a six-course chemotherapy treatment. Roberta ignored this recommendation and instead sought a third opinion from Dr. Streeter. He recommended a slightly different regimen of chemotherapy consisting of six courses. The first one was administered on January 31, 1994, two months after Dr. Frank recommended that she immediately begin chemotherapy. Roberta then ceased those treatments after completing only four of the six chemotherapy sessions with Dr. Streeter. Dr. Cross acknowledged that receiving only two-thirds of the recommended chemotherapy treatments reduced Roberta's chances of survival. R. at 254. In essence, although four physicians had recommended that Roberta undergo a mastectomy, she instead elected to have a lumpectomy.
Notwithstanding this evidence, the Kings urge this court to accept their contention that Roberta could not have been contributorily negligent because any alleged negligent conduct on her part occurred only after Dr. Clark's failure to diagnose and treat her cancer. In Smith v. Hull, we observed that the evidence established that the patient's conduct and the doctor's conduct occurred simultaneously and, therefore, it was proper to instruct the jury with respect to the plaintiff-patient's contributory negligence. Id. at 192. In that case, the plaintiff suffered from male pattern baldness and initially consulted with Dr. Hull for prosthetic hair treatments in April or May of 1979. Id. at 186. Throughout the course of treatment, Dr. Hull repeatedly warned Smith of the risk of possible complications. Id. at 188-89. However, Smith continued to receive injections and numerous scalp reductions from Dr. Hull throughout a five-year period. Prior to each scalp reduction surgery, Dr. Hull warned Smith of the possible complications including scarring and infection. Id. at 189-90. Smith eventually filed a complaint against Dr. Hull for medical malpractice because of the severe scarring that appeared following the surgeries. The jury returned a verdict for Dr. Hull. On appeal, we determined that the *1048 trial court properly instructed the jury with respect to Smith's contributory negligence. Specifically, we noted that Smith failed to heed Dr. Hull's advice regarding the frequency of treatment and the limited number of surgeries that should have been performed. Id. at 192.
As in Smith, the medical evaluations, diagnostic testing and treatment for Roberta's cancer occurred over a lengthy period of time. Because the injury, the lost opportunity to survive, necessarily occurred over this same lengthy time period, or at least until Roberta placed herself under the care of a different physician, the jury might reasonably infer that Roberta's actions or inactions occurred simultaneously with any fault on Dr. Clark's part to reduce her chance of survival. Inasmuch as Roberta's conduct was seemingly united with the actions of Dr. Clark, the jury could properly conclude that her conduct contributed as a legal cause to the harm that [s]he suffered. See id. at 191.
Finally, we note that Dr. Edward Brandenberger, a member of the medical review panel who reviewed Roberta's claim, testified at trial. Dr. Brandenberger remarked that, after reviewing Roberta's medical records and other relevant documents which were unavailable when the medical review panel convened, it was apparent that Roberta only had fibrocystic changes in her breast in 1992 and in January and June of 1993. R. at 714-16. Moreover, Dr. Brandenberger did not believe Roberta's indication that she found a lump in the upper quadrant of her breast in November of 1992, and further maintained that the cancer could not have occurred until October of 1993. R. at 717. Thus, Dr. Brandenberger acknowledged that Dr. Clark was under no obligation to biopsy the cystic lesions and that the breast examination Dr. Clark performed on January 29, 1993, complied with the standard of care.[3] R. at 699-700, 733.

CONCLUSION
In light of our discussion above, the evidence presented at trial supports the reasonable inference that Roberta may have delayed in seeking proper treatment, may have delayed in obtaining the diagnostic testing that Dr. Clark had ordered, and may have failed to follow through with the subsequent recommended treatment. Moreover, the jury could have concluded that Roberta's conduct may have demonstrated a disregard for the risk, and that she may have voluntarily incurred the risk of disregarding the recommendations of four physicians to undergo a mastectomy and treatment.
Inasmuch as our standard of review prohibits us from reweighing the evidence or judging the credibility of witnesses, we decline Roberta's invitation to reweigh the evidence in her favor. Thus, we find that the evidence was sufficient to support the trial court's jury instructions on the issues of contributory negligence and incurred risk. Accordingly, we find no error.[4]
Judgment affirmed.
GARRARD, J., concurs.
ROBB, J., dissents with opinion.
ROBB, Judge, dissenting
I respectfully dissent from the majority opinion. I believe that the majority opinion departs from already established standards set by this court in medical malpractice actions. *1049 Based on a review of our contributory negligence jurisprudence in medical malpractice actions, it is clear that a contributory negligence instruction is warranted only if two prerequisites are met. First, there must be some evidence that any action or inaction on the part of the patient fell below a standard of reasonableness. As the majority notes, "[t]he general rule on the issue of the plaintiff's contributory negligence is that the plaintiff must exercise that degree of care that an ordinary reasonable man would exercise in like or similar circumstances." Memorial Hospital of South Bend, Inc. v. Scott, 261 Ind. 27, 300 N.E.2d 50, 56 (1973). To conclude that a patient engaged in conduct, `X', without evidence that the patient negligently did `X' is not enough to warrant a contributory negligence instruction. See J.C. Penney Co., Inc. v. Wesolek, 461 N.E.2d 1149, 1151 (Ind.Ct.App.1984) modified on other grounds by 465 N.E.2d 763 (Ind.Ct. App.1984) (holding that in order to issue an instruction on contributory negligence, the evidence must show that the plaintiff did not act as a reasonable person would have acted in the same position), trans. denied. There is simply no danger of reweighing the evidence in such a case because there is no evidence to reweigh. Again, when reviewing a trial court's issuance of an instruction, this court must determine whether there is any evidence to support the instruction. Thus, while negligence is ordinarily a question for the jury, in the case of an instruction, such a determination is within the province of this court when only one reasonable inference can be drawn from the evidence. See Leppert Bus Lines, Inc. v. Rayborn, 133 Ind.App. 325, 182 N.E.2d 260, 263 (1962) (holding that the question of contributory negligence does not become a question of law for the court unless only one reasonable inference or conclusion can be drawn from the evidence). Accordingly, when, as a matter of law, the defendant has not presented any evidence that the conduct of the plaintiff fell below a standard of reasonableness, a contributory negligence instruction is unwarranted.
Second, the action or inaction in question must have united with the physician's negligence in producing the injury, being simultaneous and cooperating with the physician's fault. See Smith v. Hull, 659 N.E.2d 185, 192 (Ind.Ct.App.1995), trans. denied. In a failure to diagnose case in which the patient complains of a loss of chance of survival, identifying the injury can be difficult. In this case, Mrs. King alleges that her chances for survival dropped from eighty percent (80%) to twenty percent (20%) by the time she stopped seeing Dr. Clark. I conclude that Dr. Clark's period of liability stopped when Mrs. King decided to stop seeing Dr. Clark as her physician. Any subsequent conduct on Mrs. King's part which, for example, decreased her chances for survival below twenty percent (20%) goes to the issue of mitigation of damages because such conduct could not possibly cause the original injury, that is, the initial decrease from eighty percent (80%) to twenty percent (20%). In other words, it is impossible for such conduct to be a coincident cause with Dr. Clark's alleged malpractice as Dr. Clark's conduct and Mrs. King's conduct contribute to two different injuries.
The majority holds that Mrs. King was contributorily negligent in: 1) waiting three to four weeks before seeking medical care when her breast became red in October 1993; 2) delaying in getting the diagnostic testing that Dr. Clark ordered after her breast was swollen; and 3) making treatment choices following her diagnosis that allegedly reduced her chances of survival. I will address each of these instances in turn, demonstrating that each fails to meet one of the prongs set forth above.

a. Delay in seeking treatment and diagnostic tests in October 1993
Mrs. King testified that her breast became sore and red in the first week of October 1993. On October 23rd, she awoke to discover her breast swollen and sore. Her testimony is as follows:
[T]he first week in October . . . my left breast and that area that was firmer and harder became red and it was sore. . . . I tried not to worry about it because, you know, it was just fibrocystic. So I was just kind of watching it for a couple of weeks and then on October 23rd I woke up in the morning and my breast had ballooned out to about at least twice as big as normal *1050 and I was completely alarmed . . . . It was very red clear up to my collarbone and it was hot . . . . I was very afraid. I just knew this was breast cancer because my mother had had it. So I called [Dr. Clark's] office and I got in to see him pretty quickly. I don't remember if it was that day. I think it was that day. . . .
(R. 89). The majority argues that her failure to seek treatment as soon as her breast became red and sore amounts to contributory negligence.
Based on Mrs. King's own testimony, she did not notify Dr. Clark of her sore breast because she was relying on Dr. Clark's previous diagnosis of her condition. Mrs. King complained of a problem with her breast in November of 1992, January of 1993, and June of 1993. After each visit, Dr. Clark informed Mrs. King that she had fibrocystic breasts. When her breast swelled and caused her alarm, she immediately notified Dr. Clark. Even during this October 23rd visit, Dr. Clark still failed to diagnose her condition, concluding that her problem stemmed from a breast infection. In determining whether this evidence in any way establishes that Mrs. King's actions were unreasonable, I take heed of Judge Sullivan's cautionary remarks regarding a patient's duty of care:
Indeed, I agree that with respect to his actions taken while under a physician's care, a patient owes himself a duty of due care which extends beyond these narrow categories. However, this duty does not extend to diagnosing his own condition or questioning his physician's diagnosis of his condition. In fact, quite the contrary appears to be true; the fiduciary nature of the physician-patient relationship and the special skill of the physician bestow upon the patient the right to rely upon his physician's diagnosis and treatment. "Since the patient may rely on the directions of his physician, it follows that he incurs no liability by doing so." Rather, the patient's duties to himself would appear to extend to his engagement in "everyday" type activities; or in other words, activities which, though perhaps undertaken while at a hospital or under a physician's care, are not themselves related to the diagnosis or treatment of the patient's condition.

Smith, 659 N.E.2d at 192-93 (Sullivan, J., concurring) (emphasis added) (citations omitted) (quoting 61 Am.Jur.2d Physicians, Surgeons, and other Healers § 303 (1981)); see also Fall v. White, 449 N.E.2d 628, 634 (Ind. Ct.App.1983) (cautioning that a patient does not have a duty to diagnose his or her own condition). I believe that Judge Sullivan's warning and this court's caution in Fall apply to this case. Mrs. King relied on Dr. Clark's diagnosis until her condition alarmed her. Thereafter, she immediately notified Dr. Clark of her condition. Under these circumstances and based on the record, I do not believe that Dr. Clark has presented any evidence that her actions were unreasonable. Such a conclusion is consistent with this court's determination that the standard of reasonableness for patients should not be extended to require patients to diagnose their own conditions or second-guess their physician's diagnosis. Thus, while there is evidence that Mrs. King failed to inform Dr. Clark when her breast initially became red and sore, there is no evidence that she negligently failed to do so.

b. Delay in getting diagnostic tests
Dr. Clark claims that Mrs. King delayed getting an ultrasound and a mammogram for five weeks. When Mrs. King reported to Dr. Clark on October 23rd with a swollen breast, Dr. Clark ordered a mammogram and an ultrasound. However, the radiologist canceled these tests because Mrs. King's breast was too sore. Accordingly, Dr. Clark ordered another test on November 13, 1993. Mrs. King did not have these tests done; rather, she transferred her care to Dr. Cross, a breast specialist, who performed a needle biopsy on November 29, 1993. Thus, the alleged five week delay actually involves two delays. The first occurred on October 23rd when the radiologist canceled the tests which were reordered on November 13. The second delay occurred on November 13 when Mrs. King decided to get a second opinion rather than undergo Dr. Clark's tests.
Dr. Clark has not presented any evidence that the delay from October 23rd to November *1051 13 should be considered conduct on the part of Mrs. King that fell below a standard of reasonableness. As the evidence indicates, the radiologist canceled the tests because, at the time, Mrs. King's breast was too swollen and sore to continue with the procedure. To argue that a physician's decision to wait and conduct diagnostic tests when they are not too painful constitutes contributory negligence on the part of the patient is incredulous. Presumably, the majority would require Mrs. King to second guess her radiologist's medical opinion in order to comport with her proper duty of care. Independent of this erroneous standard of care, the majority has pointed to absolutely no evidence that this decision fell below a standard of reasonableness. In fact, Dr. Clark himself did not reschedule Mrs. King's ultrasound until her third subsequent visit to him on November 13, even in spite of the fact that on October 30 Mrs. King reported to Dr. Clark that she was less sore and no longer needed pain medication. Is the majority charging Mrs. King with more knowledge regarding the impending, immediate necessity of this procedure than her treating physician?
As well, the majority can point to no evidence that Mrs. King was unreasonable in her decision to forgo the diagnostic tests on November 13, the second delay. The majority only suggests that the statistical studies on Mrs. King's type of cancer show that the two week delay made her prognosis poorer, and therefore, her delay may have contributed to her injury, a loss of chance of survival. It seems less than fair for this court to impute such knowledge to a patient when the physician's own negligence allegedly prevented the patient from knowing she had cancer. Mrs. King testified that she was sure that she had breast cancer; however, Dr. Clark diagnosed her condition as a breast infection. Dissatisfied with this explanation, Mrs. King decided to get a second opinion. Whether or not her cancer grew worse in the two week delay is irrelevant. The question is whether or not Mrs. King's inaction fell below a standard of reasonableness. I am unwilling to conclude that a patient under Mrs. King's circumstances should be required to know the possible rate at which her cancer, of which she has no knowledge, is growing. Her failure to get Dr. Clark's diagnostic tests resulted only from her desire to get a second opinion of her diagnosis. Based on an extensive review of the record, I can find no evidence indicating that Mrs. King's conduct fell below a standard of reasonableness.
Moreover, Dr. Clark has not presented any evidence that Mrs. King's actions proximately caused her damages, and therefore, he is not entitled to a contributory negligence instruction. See Memorial Hospital, 261 Ind. at 36, 300 N.E.2d at 56. Mrs. King presented evidence that while she was a patient of Dr. Clark, she suffered a loss of chance of survival. As mentioned, she alleges that as a result of Dr. Clark's malpractice, her odds of surviving the cancer went from eighty percent (80%) in November 1992 to twenty percent (20%) in October 1993. According to the evidence at trial, Mrs. King's odds of surviving the cancer dropped to twenty percent (20%) when her breast became inflamed on October 23, 1993. At the time of the October 23rd visit to Dr. Clark, therefore, Mrs. King had already suffered the complete injury of which she now complains.[5] Accordingly, both delays in obtaining the diagnostic tests occurred after she had suffered her injury. Thus, Dr. Clark cannot prove that Mrs. King's conduct "unite[d] in producing the injury, being simultaneous and cooperating with the fault of the defendant." Smith, 659 N.E.2d at 192; see also Harris v. Cacdac, 512 N.E.2d 1138, 1140 (Ind.Ct.App. 1987), trans. denied.
I find Harris v. Cacdac particularly applicable to the facts of this case. In Harris, this court held that the issuance of a contributory negligence instruction to the jury was reversible error. The patient in Harris sued her physician due to an unnecessary neck surgery. The physician successfully persuaded the trial court that because of the *1052 patient's failure to follow all of his instructions after the surgery he was entitled to a contributory negligence instruction. This court reversed, holding:
A patient may be contributorily negligent by failing to follow a physician's instructions. However, in order to constitute a bar to recovery, contributory negligence must be a proximate cause of the injury. It must unite in producing the injury and thus be "simultaneous and co-operating with the fault of the defendant . . . (and) enter into the creation of the cause of action."
Harris, 512 N.E.2d at 1139-40 (citations omitted) (quoting 61 Am.Jur.2d Physicians and Surgeons 302, p. 449 (1981)). In addition, the Harris court stated:

Negligence on the part of the patient or of those having him in their charge, which occurs wholly subsequently to the physician's malpractice which caused the original injuries sued for, is not a complete defense to any recovery against the physician, but serves to mitigate the damages, preventing recovery to the extent the patient's injury was aggravated or increased by his own negligence, or those having his custody, although he is entitled to recover for the injuries sustained prior to his contributory negligence.
Id. at 1140 (quoting Annot., 50 A.L.R.2d 1043, 1055) (emphasis added). As in Harris, Mrs. King's alleged contributory negligence occurred subsequent to her physician's alleged malpractice. Thus, any such negligence on the part of the patient must serve only to mitigate damages. See id.
If we decide otherwise, nearly any conduct on the part of a patient at any time before death could completely bar liability in a failure to diagnose case, no matter how egregious the malpractice may be. The majority's opinion is at odds with case law which dictates that contributory negligence occurs only when the conduct of the patient is simultaneous with the physician's negligence in producing the injury of which the patient complains. The majority concludes, on the other hand, that a patient can contribute to a physician's malpractice long after she is no longer even a patient of the physician. Thus, the only patients whose claims are secure from a future bar to recovery are those patients who are eventually cured or those patients who die. Moreover, any treatment decisions necessitated by a physician's malpractice could also serve to bar liability for that same malpractice even if the patient has long since ceased contact with the defendant-physician. Such a policy is, I believe, unjust and unwise.

c. Treatment choices
Mrs. King made several treatment choices after leaving Dr. Clark's care that the majority claims contributed to her injury. Among them are that she: 1) delayed receiving her chemotherapy treatments, 2) elected to take only four rounds of six rounds of chemotherapy, 3) elected to undergo a quadrectomy rather than a mastectomy, and 4) decided not to undergo a bone marrow transplant. The trial court justified its instruction on contributory negligence based on the latter decision of Mrs. King. I believe that the trial court was incorrect because the treatment decisions occurred after Mrs. King was no longer a patient of Dr. Clark, and therefore, any alleged malpractice must have occurred prior to Mrs. King's treatment decisions.[6]
Again, by the time Mrs. King's cancer was diagnosed, her chances for survival had dropped from eighty percent (80%) to twenty percent (20%). Thus, before she was able to obtain treatment, she had already suffered *1053 the damage of which she now complains. Her subsequent decisions regarding treatment, therefore, can only serve to mitigate damages. See Harris, 512 N.E.2d at 1140. Additionally, I am unwilling to conclude that Mrs. King's decisions made her negligent when the physician allegedly placed her in the position of making such major medical decisions. For example, Dr. Lottich testified at trial that the bone marrow transplant may have provided "a possible benefit" to Mrs. King; however, she also testified that for some patients the procedure is fatal. (R. 335). Mrs. King made very difficult choices that she would not have had to consider save Dr. Clark's alleged negligence. Again, her decisions were subsequent to any malpractice of Dr. Clark, and therefore, the instruction is erroneous.
Nevertheless, the majority argues that the holding of Smith supports a different conclusion. The majority analogizes the scalp reduction treatments in Smith to the care provided by Dr. Clark in this case, alleging that in both cases, the malpractice occurred over a long period of time. The majority concludes, therefore, that Dr. Clark's malpractice was not a discrete event and coincided over time with Mrs. King's alleged negligent conduct. The majority's analysis of Smith is erroneous for two reasons. First, Mrs. King's treatment decisions were made after she was no longer Dr. Clark's patient. On the contrary, in Smith, the patient's decision to proceed with treatments were made with the defendant-physician. In fact, the physician in Smith warned the patient against proceeding with treatments in a way desired by the patient. Mrs. King never consulted with Dr. Clark regarding her treatments; thus, it is a logical impossibility that her alleged negligence in this regard cooperated simultaneously with Dr. Clark's negligence. Furthermore, the majority's assumption that Mrs. King's treatment decisions made her damages worse is irrelevant to the determination of whether Mrs. King was contributorily negligent. The focus of such an inquiry is on the injury of which she now complains. As in Harris, Mrs. King's alleged negligence which occurred after the malpractice may have made her damages worse, but it did not cause the injury of which she complains, the loss of chance of survival from eighty percent (80%) to twenty percent (20%).
Second, the medical treatments provided in Smith involved elective, cosmetic procedures. The patient in Smith decided to undergo several procedures with complete knowledge of the risks. Additionally, the procedures themselves caused the damage to the plaintiff. In the present case, Mrs. King's treatment decisions occurred after she was damaged by Dr. Clark's alleged failure to diagnose. The need for the treatment decisions presupposes that Mrs. King was already damaged by Dr. Clark's alleged malpractice. To argue that a treatment decision necessitated by a party's negligence could also join simultaneously and coincidentally with that negligence is to argue the absurd position that the cause exists simultaneously with its own effect. Thus, the majority's analysis of Smith has absolutely no application to the facts of this case.
I conclude that the trial court abused its discretion when it submitted to the jury an instruction on contributory negligence. To conclude otherwise would dramatically change the degree of care required of patients in a medical malpractice action and would change medical malpractice jurisprudence so as to eliminate the necessity that a patient's action or inaction must unite with the fault of the physician in creating the damages in order to act as a bar to recovery. Furthermore, I find it an incredulous and unjust rule of law to place on patients the responsibility of choosing those treatments a court will later see fit in order to preserve an otherwise valid claim against a physician. In this case, Dr. Clark produced no evidence that Mrs. King's treatment choices affected her long term survival. In fact, the only evidence that the majority can point to regarding contributory negligence is a patient desperately trying to obtain an accurate diagnosis of cancer and thereafter trying to obtain the treatments that best addressed all of her concerns. It is not for this court and much less for a defendant-physician to prioritize a patient's concerns when obtaining life-saving treatments made necessary by another's negligence. I believe the majority's holding in this regard is violative of Mrs. *1054 King's personal autonomy, right to privacy, and right to redress.
Moreover, a paragraph on page 1048 of the majority opinion wherein the majority discusses evidence which it believes suggests that Dr. Clark did not commit malpractice discusses an issue not before us. The intention of this discussion appears to be in support of the trial court's decision to issue an instruction on contributory negligence. The discussion, however, is not relevant to the issues at hand and suggests that the majority is basing its opinion more on the belief that Dr. Clark did not commit malpractice than on whether the trial court should have instructed the jury on contributory negligence. I would agree with the majority that the issue of Dr. Clark's liability is a question for the jury, but that is not the issue we are asked to decide today.

d. Incurred Risk
The majority applies incurred risk to medical malpractice actions absent any legal authority or reasoning. Contrary to the majority opinion, the Smith opinion did not apply incurred risk to medical malpractice.
The doctrine of incurred risk is described as follows:
The doctrine of incurred risk is based upon the proposition that one incurs all the ordinary and usual risks of an act upon which he voluntarily enters, so long as those risks are known and understood by him, or could be readily discernible by a reasonable and prudent man under like or similar circumstances.
Kroger Co. v. Haun, 177 Ind.App. 403, 408, 379 N.E.2d 1004, 1008 (1978) (quoting Stallings v. Dick, 139 Ind.App. 118, 210 N.E.2d 82, 88 (1965)). The doctrine of incurred risk has not been applied to medical malpractice cases; however, in Judge Sullivan's concurring opinion in Smith, he questioned whether the facts of that case would be best addressed by the assumption of the risk doctrine.[7]Smith, 659 N.E.2d at 194, n. 6. Before writing that the assumption of the risk doctrine would be more applicable to the facts of Smith, Judge Sullivan was careful to limit his analysis:
This proposition is admittedly problematic if applied strenuously in medical situations where the patient's health is at stake prior to seeking treatment. In those circumstances, it is vitally important that a physician not escape liability upon the ground that a patient elected or sought a particular course of treatment, when it is the physician's very function and duty to know what is the most appropriate course of treatment. However, it may have somewhat greater force where, as here, we are dealing merely with non-essential, cosmetic procedures. In such circumstances, where the decision to seek treatment in the first place is itself elective, it seems less troubling to say that a patient could, if he chooses, exercise a somewhat greater degree of control and have greater input into the decision-making process affecting his treatment.
Smith, 659 N.E.2d at 194, n. 5.
Similarly, I conclude that the doctrine of incurred risk cannot be applied where a patient is placed in the position of having to chose between different medical procedures because of a physician's negligence. Mrs. King presented evidence that her cancer could have been detected between November 1992 and October 1993. Mrs. King presented expert testimony that during that time her chances of survival were eighty percent (80%). By October 1993, however, her chances had decreased to twenty percent (20%). Thus, if, indeed, Dr. Clark committed malpractice while Mrs. King was his patient, he caused Mrs. King's injuries and placed her in the position of choosing between major medical procedures. I am unwilling to conclude based on these facts that Mrs. King voluntarily incurred the risk of refusing certain treatments and electing other treatments. Those decisions were for Mrs. King alone, and did not affect Dr. Clark's alleged previous malpractice.
In summary, I conclude that the trial court's instructions on contributory negligence and incurred risk are erroneous. I also conclude that the error was prejudicial *1055 to the outcome of the case. As the record indicates, the trial judge himself presumed that Mrs. King's treatment choices warranted a contributory negligence instruction and an incurred risk instruction. If the trial judge erroneously presumed that such evidence could constitute contributory negligence or incurred risk, I believe it very likely the jury could arrive at the same erroneous conclusion. As an erroneous, prejudicial contributory negligence instruction warrants reversal, I would vacate the jury's verdict and order a new trial.
The majority's conclusion to the contrary, I believe, is erroneous in several respects. As mentioned, it misconstrues the nature of contributory negligence. Again, the question is not whether the patient engaged in certain conduct. The question is whether there is any evidence that the patient's conduct fell below a standard of reasonableness. Second, the majority opinion ignores the nature of a loss of chance of survival complaint in medical malpractice actions. The liability of the physician necessarily ends when his care of the patient ends. The majority opinion represents a potential bar to all patients complaining of medical malpractice in a failure to diagnose case. Under the majority opinion's analysis of this case, the only patients who could recover for a loss of chance of survival are those patients who are eventually cured or those who die. Those patients still struggling to survive are placed in the absurd and tragic position of losing an otherwise valid right to recovery by making difficult and sometimes life-threatening treatment choices which then go to the issue of liability even after the patient has had no contact with the defendant-physician. In short, the majority opinion represents a disastrous social policy which could effectively indemnify physicians from gross acts of malpractice. Whether Dr. Clark committed such malpractice is admittedly for the jury's determination, but he is not entitled to such a determination under the auspices of a contributory negligence instruction.
NOTES
[1] Oral argument was heard in this cause on January 19, 1999, in Indianapolis.
[2] While Dr. Clark did not recall whether he performed a breast examination on this date, Roberta testified that such an examination was conducted. R. at 87.
[3] As can be noted by the reader, the result reached by the dissent hinges primarily upon whether Dr. Clark presented evidence sufficient to demonstrate that Roberta's delay in seeking treatment fell below a standard of reasonableness. However, this court has determined that the issue of contributory negligence is a matter most appropriately left for the jury's determination unless the facts are undisputed and only a single inference can be drawn therefrom. Nesvig v. Town of Porter, 668 N.E.2d 1276, 1281 (Ind.Ct. App.1996). After considering all of the evidence that was presented at trial, we cannot say, as a matter of law, that a reasonable trier of fact would be left to conclude that Roberta's delay in seeking treatment could not have contributed to the harm she sustained. See Smith, 659 N.E.2d at 191. Rather, the set of facts and circumstances gives rise to a reasonable inference that Roberta failed to exercise the degree of care that an ordinary reasonable person would in like or similar circumstances.
[4] In light of our disposition of the issues with respect to the final instructions, we deem it unnecessary to address Roberta's claim that the trial court erred in denying her motion for judgment on the evidence. We also need not address the contentions asserted by Dr. Clark in his cross-appeal.
[5] Again, in a failure to diagnose case, the liability ceases when the malpractice ends. In this case, the alleged injury is a loss in chance for survival from eighty percent (80%) to twenty percent (20%), representing the entire time that Mrs. King was Dr. Clark's patient. Any conduct on the part of Mrs. King which decreased her chances of survival below twenty percent (20%), therefore, contributed to a different injury.
[6] Although I do not need to reach the issue today, I also note that Dr. Clark produced no evidence that Mrs. King was negligent in her treatment decisions. Dr. Lottich, a medical expert, testified that Mrs. King's decision to have a quadrectomy and her delay in receiving her chemotherapy did not affect her long term survival. Additionally, Dr. Cross testified that Mrs. King's decision to have a quadrectomy did not affect her chances for survival. At trial he testified: "[Mrs. King requested that] if we can do [the surgery] and save [her] breast and still have the same chances as far as living through this, then that's what [she] would prefer to do and that's the reason I consulted Dr. Sledge and . . . his suggestion was is [sic] follow her wishes, you're not going to really change her odds of beating this by taking her breast off versus doing a wide excisional lumpectomy . . . ." (R. 188) (emphasis added). Finally, Mrs. King did not complete all six rounds of her chemotherapy because the treatments were making her too sick. Dr. Clark has not offered any evidence that this decision was negligent or that it made her damages worse.
[7] Assumption of the risk and incurred risk are similar doctrines. As stated in Whitebirch v. Stiller, 580 N.E.2d 262 (Ind.Ct.App.1991), "assumed risk differs, if at all, from incurred risk only in that assumed risk arises where there is a contractual obligation." Id. at 265, n. 2.